AURELIUS, The, (FAIRCHILD v.) See Case No. 4,609.

## Case No. 658.

### The AURORA.

Kentucky.

[Cited in The Rapid Transit, 11 Fed. 327. Nowhere reported; opinion not now accessible.]

## Case No. 659.

### The AURORA.

### CURRY v. The AURORA.

Superior Court, S. D. Florida. Nov. 28, 1840.

## Case No. 660.

### The AURORA.

[4 Hall, Law J. 473; Car. Law Repos. 204.][1]

District Court, D. Rhode Island. Feb. 4, 1813.

PRIZE—TRADING UNDER ENEMY'S PASS.

[Where an American ship-owner pays for, and obtains from an authorized agent of Great Britain, a British license of pass and trade, as protection for a voyage on the high seas, without the permission of his own government, the two countries at the time being at war, the ship is subject to capture and confiscation as prize of war.]

[In admiralty. Libel by the United States against the ship Aurora for condemnation as prize of war. Judgment of condemnation.]

HOWELL, District Judge. This was a libel against the ship Aurora, of Newburyport, prize to the privateer Governour Tompkins, of New York, found sailing under a British license. The principal documents produced on the part of libellants were—a consular copy of a letter from Admiral Sawyer, commanding on the Halifax station, referring to a previous correspondence between the admiral and Andrew Allen, Jr., British consul at Boston, on the subject of supplies from America. reciting the necessity and policy of maintaining a constant supply of provisions from America to the British West India islands, with assurances to the consul, that his majesty's vessels of war would be directed to permit to pass and fully to protect all American vessels so laden and bound, and which should have on board the pass or license of the consul, with a copy of the admiral's letter authenticated by the consul at Boston with such authenticated copy annexed; also, a pass of the consul from New-

[1] [Car. Law Repos. contains partial report only.]

buryport to Norfolk, the port where the Aurora was to take in her cargo for the West Indies.

The official papers explicitly stated the intention to be a supply of the British West India islands, although the ship's papers purported a voyage to a neutral port.

John Woodward, for libellant, contended that the statutory forfeitures of congress had no bearing on the case, excepting so far forth as a binding municipal regulation was auxiliary to the provisions of international law; that "the obtaining from an authorized agent of Great Britain, paying for sailing under, and exhibiting on the high seas, as protection for the voyage, a British license of pass and trade, by an American citizen, without the permission of his own government, the two countries being at war, are in themselves cause of capture and condemnation, as prize of war." To support this proposition, a variety of grounds were taken, among which were that licenses were factitious, and not a part of the law of nations, but the creatures 1 of prerogative, and that confined to municipal regulations, or 2 of compact, or 3 of parliamentary provision; that the licenses in question were against the nature and law of war, as they put it in the power of particular individuals to relax or abate the rigour of the war; against the obligations of allegiance; and that the stipulations of such licenses could not be enforced by any known law. That the obtention and possession of those licenses to pass and supply, and the sailing under them, knowing of the war, was a trading with the enemy, independent of the port of destination and of the right of property, which may be the subject of trade; that the case of a license to trade to a citizen or subject from his own sovereign, was distinct from that of a license to a citizen or subject of one of the belligerents from the enemy, without the sanction of his own government; and so would be the supposed case of the neutral, for no question like the present could arise between the neutral citizen or subject and his own nation, as that nation would not be a party to the war; and the description of rights here involved would not in that case be in question.

"The question," said Mr. Woodward, "whether the property be American or British, matters not, provided the indirect or direct trading with the enemy be established. If you use your property so as commercially to benefit and carry into effect the prescribed and stipulated commercial views of the enemy, and under a formal license of protection or supply, this is as much trading with the enemy, as if the subject of the trade were the property of the enemy, and the destination an enemy port. In the latter case you trade direct—in the former indirect. If a different doctrine prevailed, national right would be sacrificed at the shrine of the mean-est artifice. But if you pay the enemy, for such license, the case is still stronger, as the transit of the medium of commerce stamps a commercial character upon the transaction, and in this light alone converts it into a supply." As to the locality in the inception of this transaction, it is the known legal rule of construction, that the deleterious character is communicated to the ship, the cargo, and the voyage, for which the transaction is intended to provide, and which are described on the face of the licenses." "Much, as to the interpretation and application of the rules of the law of nations, will depend upon the character of war in which we are engaged. The war of the United States with Great Britain is a war between two maritime and commercial nations, in support of an independent commerce. The rules of decision which have applied the law of nations to the conduct of the citizens of each belligerent, have always been so construed and applied as to effectuate the notorious reasons and avowed policy of the war. This is not a theory, but has been emphatically pronounced by the decisions, to which I have referred; and it will be found by those decisions, that the principles of the law of nations have always been, under legal discretion, restrained or enlarged so as to effectuate and not intercept the notorious and avowed policy of the war. And more particularly has this principle been enforced upon questions arising upon the conduct of a citizen of one of the belligerents with his own nation; which is the present case,—To trade with or hold a commercial intercourse, whether by person or property, with the enemy, without the license of one's own government, is proven, by all the writers upon the law of nations, and all decisions touching this point, as adverse to the policy of a war waged for the purpose of commerce—that it amounts to a misdemeanor, and is cause of confiscation and condemnation. Suppose our citizens be permitted thus to obtain, pay for, and act upon these licenses; they would be in the practice of all the evils and derangements which the law of war is intended to prevent. They would facilitate treacherous correspondence, information and supplies to the enemy—the very evils assigned for the prohibition of all commercial intercourse; or, in the language of Sir William Scott, (in the case of The Jonge Pietre,) "all communication, direct or indirect, without the license of government," with the enemy. The anomaly of a citizen at peace and his nation at war, would emphatically exist; nay—the absurdity of that citizen making his peace and his fortune by the disposition of the enemy, obtained adversely to that of his own government. It is also easy to perceive, that by these licenses it would be in the power of the enemy to destroy or counteract the internal commercial policy, and relations of the states, or politically to distract the union, by concentrating the trade into some par-

ticular state, or casting it into the hands of a particular party. It is the language of a finished civilian, that, "there is no such thing as a war for arms and a peace for commerce."

"If we silently permit our citizens to traverse the ocean under such licenses of pass and supply from the enemy, it has been already proven, that by basest collusion between American citizens and the British government, we enable the enemy to take by stealth a portion of our national sovereignty, and if this high principle of national honour thus bear the touch, it would be better to surrender the whole. In a commercial war, which is always preventive and restrictive, by such licenses of pass and supply, the enemy would assume the right of regulating the commerce and directing the capital of our own citizens. The independence and integrity of one of the belligerents would be lost in the dependence and prospects of its citizens or subjects upon the authority or courtesy of the other. The civil relation, the national pride, and the boasted morals of our countrymen would be corrupted or destroyed by the deleterious influence of foreign gain; and that distinguishing and repellant point of character which marks the American citizen, both at home and abroad, and which now stamps our national character upon the fears and the admiration of the world, would be found at the feet of our enemy or lost in the mazes of British corruption."

The Attorney-General Burrell, and Mr. Boss of Newport, as counsel for the claimants, Clark and Wheelwright of Newburyport, having closed their argument, Mr. Robins, United States' district attorney, was about to begin, when the court superseded an argument on his part, by pronouncing judgment, condemning the ship and cargo to the captors. The judges' opinions were in complete coincidence with the doctrines and arguments above set forth.